UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAMELA JAROSE,

          Plaintiff,

    v.

COUNTY OF HUMBOLDT,

          Defendant.

Case No. 18-cv-07383-RS

**ORDER ON PLAINTIFF'S MOTION TO EXCLUDE SUPPLEMENTAL REPORT OF JOSEPH NILAND AND PLAINTIFF'S MOTIONS IN LIMINE**

Plaintiff and Counter-Defendant Pamela Jarose, executor of the Estate of John R. Braun ("Plaintiff"), and Defendant and Counter-Plaintiff County of Humboldt ("Defendant") bring suit to assign and/or apportion liability for costs of hazardous waste cleanup at certain real property located in Eureka, California. The parties bring claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, and the California Hazardous Substances Account Act ("HSAA"), Cal. Health & Safety Code § 25300, *et seq.*, as well as related claims for nuisance, breach of contract, and equitable indemnity. Pending are two motions: Plaintiff's Motion to Exclude the Supplemental Expert Report of Joseph Niland and Plaintiff's Motions in *Limine*. For the reasons discussed below, the Motion to Exclude the Supplemental Report is granted, and the Motions in *Limine* are granted in part and denied in part.

## I.   BACKGROUND[1]

### A.    Factual Background

This action concerns environmental contamination in the area of Fifth and J Streets in Eureka, California, on and around the Humboldt County Civic Center ("Civic Center"). In 1993, as part of its development of the Civic Center, Defendant acquired from John R. Braun ("Braun") a parcel of land located at 411 J Street (the "Braun Parcel"). The Braun Parcel was contaminated with certain hazardous waste, including perchloroethylene ("PCE").

Contamination of the Braun Parcel with PCE is the result of the operation of a dry cleaner on the property from the late 1940s to early 1970s. Braun acquired the property in 1971 and transferred it to Defendant through inverse condemnation proceedings in 1993. Braun and Defendant were aware of subsurface PCE contamination at the time of the transfer; however, the extent of the contamination was undetermined. Braun and Defendant executed a stipulated judgment approving Defendant's condemnation of the Braun Parcel and compensation to Braun for the taking. Under the terms of the stipulated judgment, Braun "is responsible for all costs of hazardous waste cleanup originating on [the Braun parcel]." Dkt. 106 at 5. This obligation terminates upon obtaining certain certifications from the Northcoast Water Quality Control Board (the "Board"). To date, those certifications have not been obtained.

By March 1994, as a result of clean-up efforts undertaken by Braun, the Board certified that "[a]ll immediate, on-site cleanup actions [had] been completed." *Id.* at 6. The on-site cleanup consisted largely of soil extraction, which removed the source of the PCE contamination. However, the Board advised that additional work, *i.e.*, assessing and remediating groundwater contamination, remained. Over the course of the next twenty-four years, it appears little was done to address the groundwater contamination. During that time, the Board issued to Defendant and Braun various Cleanup and Abatement Orders and Notices of Violation.

---

[1] The factual and procedural background is set forth in detail in the Order on Parties' Cross-Motions for Summary Judgment and Order Denying Motion to Modify Case Schedule to File Motion to Stay. Only those matters pertinent to resolution of the instant motion are recited herein.

1    By no later than 2009, the Board identified Defendant's Sign Yard as a potential additional

2    source of contamination and raised concerns that a groundwater plume from the Civic Center was

3    bifurcating, mingling with a plume from the Sign Yard, and threatening to discharge into

4    Humboldt Bay. In or about April 2016, the Board also raised concerns regarding a dewatering

5    sump system (the "Sump System") installed in 1958 in the Courthouse adjacent to the Braun

6    Parcel. The Sump System discharges extracted groundwater to a storm water drain, which

7    discharges to Humboldt Bay. Subsequent testing detected the presence of PCE in the Sump

8    System. The existence of the Sump System was unknown to Braun and those contracting on

9    behalf of Defendant at the time the stipulated judgment was executed.

10    At the heart of this action lies a dispute between Plaintiff and Defendant regarding

11    Plaintiff's liability with respect to groundwater remediation on and around the Civic Center. In

12    addition to raising legal questions regarding the Estate's contractual and statutory liability, the

13    action involves factual questions regarding the extent to which groundwater contamination at the

14    Civic Center is attributable to contamination originating on the Braun Parcel (or other sources), as

15    well as whether, and to what extent, operation of the Sump System has exacerbated the

16    contamination.

17    **B.    Procedural Background**

18    As is pertinent here, an Order for Pretrial Preparation was entered on May 29, 2019. In

19    November 2019, Plaintiff filed a Motion to Modify the Scheduling Order for Leave to Amend the

20    Pleadings. In connection with its opposition to the motion, Defendant first mentioned that it might

21    seek a stay of the case to conduct further site investigation and formulate a remedial action plan.

22    The order denying Plaintiff's Motion to Modify the Scheduling Order noted that Defendant had

23    not filed such motion and provided that the matter of amending the pleadings could be revisited if

24    the pretrial schedule was later vacated due to a stay.

25    Fact discovery closed on January 17, 2020. Experts were disclosed on February 7, 2020, at

26    which time Defendant's expert Joseph Niland's initial expert report was produced. Niland's

27    deposition was taken on March 10, 2020, and expert discovery closed on March 20, 2020.

28

United States District Court
Northern District of California

1    Nevertheless, Mr. Niland and others at the firm, Geosyntec, continued investigation work

2    regarding contamination of the Braun Parcel. In May 2020, Defendant also provided additional

3    disclosures regarding historical ownership of the property, incurred costs, and new witnesses,

4    which gave rise to a discovery dispute. The assigned Magistrate Judge declined to strike

5    Defendant's belated disclosures but noted that, "[g]iven the interplay of the disclosures with expert

6    opinions, the plaintiff may have reasonable arguments about the appropriate scope of evidence at

7    trial." Dkt. 70 at 7. It was suggested that the issue would be more properly addressed "in a motion

8    in limine about the appropriate scope of expert testimony." *Id.*

9        Thereafter, the parties filed cross-motions for summary judgment. After the motions were

10   fully briefed, Defendant filed a Motion to Amend the Scheduling Order to seek a stay until further

11   site investigation was completed and a remedial action plan was approved. On October 11, 2021,

12   while those motions were pending, Defendant served the Niland supplemental expert report that is

13   the subject of one of the instant motions. On March 17, 2022, an order issued on the parties' cross-

14   motions for summary judgment. The order granted Plaintiff's motion for summary judgment on all

15   but two of Defendant's claims for relief. Thus, as to Defendant's claims, only those based in

16   contract remain. Shortly thereafter, an order issued denying Defendant's motion to modify the

17   case schedule to move for a stay. Now pending is Plaintiff's Motion to Strike and Exclude the

18   Supplemental Expert Report of Joseph Niland, as well as Plaintiff's Motions in *Limine*, filed on

19   November 15, 2022, seeking to exclude opinions from Niland's original expert report, materials

20   produced after the close of discovery, and two of Defendant's affirmative defenses (allocation and

21   failure of due diligence).

22                          **II.  LEGAL STANDARD**

23        The parties must disclose the identity of any expert witness they may use at trial, along

24   with a written report prepared and signed by the witness. Fed. R. Civ. P. 26(a)(2)(A), (B). The

25   parties "must make these disclosures at the times and in the sequence that the court orders." Fed.

26   R. Civ. P. 26(a)(2)(D). A party must supplement its disclosures: (a) in a timely manner if it learns

27   that the initial disclosures were incomplete or incorrect; or (b) as ordered by the court. Fed. R. Civ.

United States District Court
Northern District of California

P. 26(a)(2)(E), 26(e)(1). For an expert who provides a report, the "duty to supplement extends both to information included in the report and to information given during the expert's deposition." Fed. R. Civ. P. 26(e)(2). If a party fails to comply with the requirements of Rule 26(a) or (e), such party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (explaining Rule 37(c)(1) "gives teeth" to the requirements of Rule 26). In addition to or in lieu of exclusion, a court may impose various other sanctions. Fed. R. Civ. P. 37(c)(1).

### III. DISCUSSION

#### A.    Motion in *Limine* #1: Exclusion of Opinions of Niland

##### 1.    Cleanup Cost Estimates (Opinions 4, 5, 6, and Exhibit 9)

Plaintiff first seeks to exclude opinions relating to the cost of cleanup in Niland's initial expert report ("Niland Expert Report")—specifically, Opinions 4, 5, and 6, along with Exhibit 9 (an accompanying cost chart). Plaintiff argues that these opinions and exhibit are: (1) too speculative and uncertain; (2) formulated by other individuals, rather than Niland, whose qualifications are unknown; and (3) not based on reliable methodology or data.

With respect to the first argument, Plaintiff contends that Niland's cost estimates are uncertain and speculative, and therefore not relevant or reliable. "Rule 702 imposes a special obligation upon a trial judge to ensure that scientific testimony is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 137 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). "[E]xpert's opinions that are without factual basis and are based on speculation or conjecture are inadmissible at trial . . . ." *Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012, 1032 (E.D. Cal. 2011) (quoting *California ex rel. Brown v. Safeway, Inc.*, 615 F.3d 1171, 1181 (9th Cir. 2010) (alteration in original). "However, [l]ack of certainty is not, for a qualified expert, the same thing as guesswork. Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Id.* (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (internal quotations and citations omitted) (alteration in

original).

Plaintiff has offered no evidence that Niland's cost estimate is without factual basis or based on speculation. Plaintiff's only argument hinges on a labeling error for an exhibit in Niland's expert report. Exhibit 9 of Niland's report is labeled as a "Rough Order of Magnitude," which Niland testified means an estimate that "could change by . . . one to ten times." Dkt. 121-2, Ex. 2 ("Niland Dep.") at 52:14-15. Niland, however, further testified that he would *not* describe the estimate as a "rough order of magnitude," but as a "planning level estimate," which has "less variability." Niland Dep. at 51:16-18, 52:21-23. Begrudgingly acknowledging Niland's testimony, Plaintiff nonetheless claims that the opinion "remains speculative with contingencies to inflate the estimate." Dkt. 121 at 3. This is not enough. Plaintiff has not shown that Niland's estimate is based on assumptions or conjecture, and fails to explain what contingencies have inflated the estimate, or why such cushion is necessarily speculative or makes the estimate unreliable. Though Niland should have taken greater care in the preparation of his expert report, the "Rough Order of Magnitude" label is not enough to show that his cost estimate is speculative and uncertain.

With respect to the second argument, Plaintiff attacks the cost estimate on the grounds that it was prepared by Niland's junior colleagues Forbess and Foot, neither of whom are disclosed experts. Plaintiff argues that Niland did not know either person's qualifications, and there are no "calculations or other documents to demonstrate" that Niland reviewed the estimate for errors, as he testified. Dkt. 121-1 at 3. As a specific example, Plaintiff points out that Opinion 4 uses an outdated 1993 interest rate for which Niland was unable to explain a basis for its use. As a result, Plaintiff argues, Niland's opinion must be excluded because it is merely "parroting" some other person's opinion. Dkt. 121-1 at 3.

This is not the case. "Federal Rule of Evidence 703 explicitly permits an expert to rely on facts or data provided by others," *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-CV-01370-EJD, 2018 WL 1611835, at *4 (N.D. Cal. Apr. 3, 2018), which includes using assistants, *Wolkowitz v. Lerner*, No. SA CV 07-777-CAS, 2008 WL 1885770, at *4 (C.D. Cal. Apr. 21, 2008), as well as collaborating with colleagues. *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir.

United States District Court
Northern District of California

1998). While an expert cannot merely "parrot the opinions of non-testifying experts," *K&N Eng'g, Inc v. Spectre Performance*, EDCV 09-1900VAP, 2011 WL 13131157, at *10 (C.D. Cal. May 12, 2011) (citation omitted), an expert does not do so if he or she substantially participates in the report's preparation. Moreover, "an expert may use assistants in performing his work, so long as those assistants do not 'exercise professional judgment that is beyond the expert's ken.'" *Wolkowitz*, 2008 WL 1885770 at *4 (citation omitted).

Here, Niland substantially participated in the formulation of the cost estimates and had the requisite expertise to rely on the data and exhibit prepared by his junior colleagues. Niland testified that he prepares cost estimates on environmental projects on a weekly, if not daily, basis. Niland Dep. at 8:9-14. He testified that *he* prepared the expert report, and relied on his colleagues Forbess and Foot for support in compiling information to support his opinion. Niland Dep. at 23:10-13. While Forbess prepared Exhibit 9, Niland Dep. at 55:23-56:3, there is no argument that that work is beyond Niland's expertise. Ultimately, the hours that Niland, Forbess, and Foot respectively spent support the conclusion that Niland substantially participated in the preparation of the cost estimate.[2]

Plaintiff also argues that Forbess' and Foot's qualifications were unknown to Niland, and invokes *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) to exclude Niland's cost estimate on those grounds. Yet the case is easily distinguishable. *ZF Meritor* held that an expert's damages estimate was insufficiently reliable where that expert heavily based the estimate off of projections of the Plaintiff's Strategic Business Plan—but the expert did not know the methodology used to create the SBP, "the circumstances under which such projections were created or the assumptions on which they were based," or the qualifications of those who prepared the SBP estimates. *Id.* at 291–93. Indeed, the expert did not even know "whether the SBP projections were calculated by ZF Meritor management, lower level employees at ZF Meritor, or

---

[2] Niland testified he spent 80 hours in preparing the cost estimate and 100 hours total on the case, and that Forbess and Foot spent approximately 100 hours apiece on the case. Niland Dep. at 24:7-21.

1     came from some outside source." *Id.* at 293. By contrast, Niland knows exactly who prepared the

2     exhibit used in his report, and both individuals are junior colleagues with whose basic training and

3     tenure Niland is familiar. Unlike the expert in *ZF Meritor*, therefore, Niland has the necessary

4     information for others to cross-examine him effectively.

5            With respect to the third argument, Plaintiff explains that an expert's testimony regarding

6     damages must be based on a sufficient factual foundation, but that Niland's damages "are not

7     based on any tangible quotes or estimates, and there was no breakdown or support [for] the basis

8     for his total values in his cost estimates." Dkt. 121-1 at 4. Niland also apparently "did not even

9     consider similar sites under the . . . regulatory agency overseeing the investigation and cleanup in

10    this case." *Id.* Furthermore, Plaintiff argues his remediation is presumptive: "no peer-reviewed

11    documentation is provided to explain or confirm the numerous assumptions in the cost estimate."

12    *Id.*

13           Plaintiff's arguments are not persuasive. Contrary to what Plaintiff argues, Niland did not

14    rely solely on the judgment and experience of others. Niland specifically testified that although his

15    associate Forbess prepared Exhibit 9, the background for the report's cost estimate, Niland

16    oversaw the work, which included discussions with Forbess about the remedial action objectives

17    and the general scope of those remediations. This Exhibit, though it does not necessarily give

18    specific calculations, does provide a component breakdown for cost estimates by category, such as

19    "Site Investigation" (which has seven line components), "Storm Drain Rehabilitation" (which has

20    five components), "Vapor Mitigation" (which also has five components), and so on. Niland Expert

21    Report, Ex. 9 (Updated Rough Order of Magnitude Remediation Estimate). Plaintiff's remaining

22    grievances with Niland's estimates—that his "presumptive" cost estimates include "technologies

23    and responses that may not even be required, as well as cumulative and overlapping potential

24    responses," Dkt. 121-1 at 4, are insufficient to show that Niland's opinions are not based on sound

25    science.

26           Relatedly, Plaintiff claims Opinions 6 (relating to the Sump's impact on the cost of

27    remediation) and 7 (the cost of cleanup if investigation on the Site had been implemented more

expeditiously) must be excluded, as they lack any independent analysis and are prejudicial to Plaintiff. Contrary to Plaintiff's argument, Niland's conclusion is based on more than just "posturing." Dkt. 121-1 at 5. For example, the report notes that the cost of remediation in 1993/1994 "would have been much less than it would be today," because "[t]he cost of goods and services alone would be substantially less in 1993/1994 than they would be today," and "the regulatory requirements for the cleanup would have [been] less stringent." Niland Expert Report at 13. These two pieces represent independent analysis—beyond the expert's main point, which is that the additional migration of the contaminants made cleanup harder—supporting his conclusion. Plaintiff's motion is therefore denied.

> 2.   Testimony Regarding the Conceptual Site Model (Opinions 2 & 4)

Plaintiff next seeks to preclude Niland from testifying about the conceptual site model ("CSM"), arguing that Mr. Niland testified in his deposition that a CSM was not prepared, but rather, was "distributed through the expert report in the data analysis," Niland Dep. at 47:17-22, and that he did not define the Site geographically for purposes of his cost estimate. By Plaintiff's estimation, this indicates that Opinions 2 and 4, which were based on the CSM, are not based on sufficient data, but more akin to Niland's own speculation and belief.[3] Plaintiff further claims that Niland later prepared a "separate CSM" "[w]ell after the close of expert discovery," "which demonstrates that his opinions and testimony at deposition were unreliable and untrue." Dkt. 121-1 at 5. As a result, Plaintiff seeks to exclude Opinions 2 and 4.

In response, Defendant argues that Opinions 2 and 4 are based on concrete data, rather than mere belief and speculation, including reports and sources other than the CSM. Defendant also points to the fact that Niland in fact responded "yes" when asked if he had prepared a conceptual site model, Niland Dep. at 21:10-11—a citation which, notably, Plaintiff omitted from its filing entirely—and argues that "[t]he Estate's reference to a separate document now labeled CSM does

---

[3] Plaintiff also cites to parts of the deposition where Niland indicates the need for the resolution of data gaps and "a more complete evaluation of all existing data," Niland Dep. at 69:20-70:4, to argue that "Mr. Niland's opinions are incomplete by his own admission." Dkt. 121 at 5.

not mean one did not exist at the time of the expert report." Dkt. 140 at 4–5. Finally, Defendant argues that an acknowledgement that there are data gaps or that the data could change does not equate to an admission that Niland's opinions are incomplete.

Even if it seems suspect for a conceptual model to exist only in disaggregated form, the extent to which a CSM exists as a self-contained, separate document is of unclear importance. Plaintiff's arguments seem predicated on the belief that Niland's failure to produce a CSM as a standalone document is a critical failure, but Plaintiff provides no explanation as to why. By contrast, Niland's testimony clearly indicates that he prepared a CSM, and believes that a CSM can be valid even if "distributed" throughout the report. The same is true for Niland's neglect to define a "Site" geographically, which Plaintiff also does not elaborate on. Defendant claims this argument should only go to the weight, rather than the admissibility, of the evidence.

Ultimately, Defendant has the better of the arguments here. If Niland subsequently prepared a CSM that is contradictory to his deposition testimony—the specifics of which, again, Plaintiff does not actually establish—the proper course is not to prevent Niland from testifying about the CSM altogether, but to emphasize such contradictions at trial and discredit his testimony. Without specific analysis about the shortcomings of Niland's actions, Niland's opinions cannot be excluded as mere speculation.[4] Accordingly, this motion is denied.

3.   Condition & Integrity of the Sump and Storm Drain Systems (Opinions 3, 5, and 6)

Plaintiff seeks to exclude Niland's testimony regarding the integrity of the sump and storm

---

[4] This is a far cry from *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019), the authority on which Plaintiff relies to argue that Niland must "show that his conclusions were the fruit of a rigorous, objectively-verifiable approach—something more than mere speculation." Dkt. 121-1 at 5. In *Timm*, the 7th Circuit affirmed the district court's exclusion of expert reports where the expert in question, "[w]hen pressed about his methodology, . . . conceded that he could point to no empirical data or controlled experiments to support his opinions," and "further acknowledged that he had not done any testing to validate his opinion, was unaware of any relevant tests conducted by others, and knew of no way others could objectively replicate his approach." 932 F.3d at 994. Here, although Niland repeats that various conclusions are "based on [our] judgment and experience doing similar work for other sites" with somewhat troubling frequency, Niland's expert report does also cite to various data sources for its opinions.

drain systems, which are included in Opinions 3, 5, and 6. Plaintiff's objection rests on two grounds: (1) Niland is not a qualified expert in engineering, and has not had any formal training or experience to support his opinions regarding the practice of designing or evaluating sewers, including conditions like flow, velocity, or infiltration/exfiltration; and (2) Niland's opinions—specifically Opinions 3, 5, and 6—fail to be based on reliable methodology, facts or data.

Pursuant to Federal Rule of Evidence 702, an expert witness "who is qualified . . . by knowledge, skill, experience, training, or education may testify . . . if," among other requirements, the expert's testimony is "based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). Plaintiff's objection that Niland "is not a registered engineer" and "does not have formal training or experience," Dkt. 121-1 at 6, is insufficient to demonstrate that Niland does not have the requisite qualifications to serve as an expert. Niland testified that he had some graduate training in environmental engineering (including a master's in environmental management), as well as experience in cost estimating on environmental projects on a near weekly basis. Niland Dep. at 7:20-8:20. Collectively, Niland claims "over 30 years of applied geoscience experience" on his CV, including "special emphasis on site investigation . . . hydrogeology, remediation and fiscal management." Niland Expert Report, Ex. 1 (Niland CV). Because FRE 702 "contemplates a broad conception of expert qualifications," *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994), and Niland does have some relevant experience and professional training, Niland will not be excluded as an expert for lack of qualification.

With respect to Opinion 3, Plaintiff takes issue with the fact that Niland either did not perform certain analyses in order to analyze the data reliably, or does not provide citations for his conclusions. For instance, Opinion 3 discusses the migration of volatile organic compounds ("VOCs") in shallow groundwater, but Niland only looked at historical groundwater flow data, instead of preparing any geologic or hydrogeologic cross-section in order to analyze the data. With respect to Niland's opinion that the dispersal of shallow groundwater north of Third Street is due

United States District Court
Northern District of California

to a "watercourse" that causes easterly or northeasterly water migration, "Niland has not cited to a single source of literature, principles, or data analysis for this watercourse opinion" and similarly has "offered no methodology . . . by which his opinion can be verified." Dkt. 121-1 at 7. Plaintiff claims Niland also offers unsupported opinions regarding groundwater elevation and the resulting impact on the storm drain system, as Niland "could not identify time periods when the elevation of groundwater was below or above the storm drain system," and relies on an exhibit (Exhibit 16), which was prepared by a junior colleague, and contains data of unknown origin. Dkt. 121-1 at 7–8.

Yet Plaintiff's arguments are either insufficiently explained, or selectively made so as not to encompass the full record. For instance, Plaintiff does not explain why the analyses it identifies, such as preparation of geologic or hydrogeologic cross sections, must occur for Niland's opinions to be based on reliable analysis. While Niland's explanation of his approach—that he "reviewed the available data and relied upon the CSM and the Site data and [his] experience on similar sites in order to form [his] opinions," Niland Expert Report at 4—is quite general and potentially subject to nuanced attack with respect to specific conclusions, Niland's testimony, such as that he "looked at historical groundwater flow data and *prepared some maps*," Niland Dep. at 41:22-23, indicates that he did engage in analysis to reach his conclusions.[5] As for his opinion on the watercourse, Niland testified that he did not think he needed to cite to peer-reviewed published literature, because the analysis would have been "generally physics." *See* Niland Dep. at 46:12-17. Niland's acknowledgment that he did not have the data for storm drain elevations is perhaps most problematic, but it appears that Niland used an assumption,[6] and Plaintiff does not explain how Niland's calculations are not reasonable.

---

[5] This is also generally supported by Niland's testimony that he spent approximately 80 hours in preparing the expert report.

[6] Plaintiff's deposition transcript excerpt cuts off before the sentence ends, but Niland begins to say, "It still made an assumption as . . ." Niland Dep. at 46:12-19. The ensuing pages (104 and on) are unfortunately unavailable from any of the exhibits.

Plaintiff's objections to Opinions 5 and 6 fare similarly. With respect to Opinion 5, Plaintiff takes issue with the fact that Niland did not obtain information about Defendant's operations or how often the sump was pumped, and objects that Niland does not explain the basis for his finding that a sump pump is a passive device or construct the counterfactual of what would happen if the pump had not been operated. Yet Niland testified that he had discussions with Defendant, and the majority of Plaintiff's arguments are of the type that would lessen the weight the evidence should be given—if unable to be properly explained—rather than the basis for a wholesale exclusion of the opinion. Likewise, for Opinion 6, Niland's failure to perform analysis of what groundwater flow would be without the sump might doom his opinion that the sump does not impact contaminants in the groundwater, and his use of an "unsupported assumption that the storm drain system is under groundwater most, if not all of the year" might weaken his conclusions regarding groundwater elevations, Dkt. 121-1 at 10—but Plaintiff has not shown that these opinions are so unsupported by fact or analysis as to be unreliable and subject to exclusion.

To be clear, the issues and analytical gaps that Plaintiff identifies are relevant, and do raise some questions about the accuracy and completeness of Niland's analysis. Certain of these critiques may even prove dispositive at trial. These do not, however, as Plaintiff claims, create "simply too great an analytical gap between the data and the opinion proffered." *Fanning v. Sitton Motor Lines, Inc.*, No. 08-CV-2464 CM/DJW, 2010 WL 4261476, at *7 (D. Kan. Mar. 10, 2010).[7] At this juncture—particularly as "the rejection of expert testimony is the exception rather than the

---

[7] Plaintiff's reliance on this case is also misplaced. *Fanning* is distinguishable, as it concerns the exclusion of an opinion by a toxicologist—not a physician—that the decedent in the case committed suicide, which in turn required assumptions about unknown and disputed facts regarding where the decedent was when he was struck by the vehicle. This opinion, moreover, was offered without any investigation into other potential causes of death. *Fanning*, 2010 WL 4261476, at *4. The *Fanning* court similarly excluded another expert's opinion that the decedent committed suicide because there was "simply . . . insufficient factual information in the record regarding the decedent's death for [the expert] to have reliably concluded that the decedent intentionally placed himself or remained in the path of an oncoming truck." *Id.* at *7. Because her assumptions about the decedent's actions were "merely speculative" and did not account for plausible alternative explanations, the expert's opinion was found unreliable. *Id.* Here, Niland's conclusions cannot be said to be mere speculation in the same manner.

United States District Court
Northern District of California

rule," *Caldwell v. City of San Francisco*, No. 12-CV-01892-DMR, 2021 WL 1391464, at *2 (N.D. Cal. Apr. 13, 2021) (quoting Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (citing cases))—there are sufficient indicia of reliability and concrete data cited in Niland's report for his opinion to pass the court's gatekeeping function. Because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," *Daubert*, 509 U.S. at 595, Plaintiff's motion in *limine* with respect to Niland's opinions regarding the sump and storm drain systems (Opinions 3, 5, and 6) is denied.

### B.   Motion in *Limine* #2: Materials Produced After Close of Fact and Expert Discovery

Plaintiff's second motion in *limine* seeks to exclude documents and testimony raised after the close of fact and expert discovery, which occurred on January 17, 2020, and March 20, 2020, respectively.[8] Specifically, Plaintiff seeks to: (1) limit the testimony by John Wellik, an expert disclosed for the first time in May 2020, solely to the authentication of documents; and (2) exclude documents in Defendant's supplemental Rule 26 disclosures.

There appears to be no genuine dispute with respect to the testimony of Wellik. Per Defendant's filing, "the parties have agreed that Wellik may be called as an authenticating witness, and Wellik is limited as such in the Joint Pretrial Statement." Dkt. 140 at 8. Based on this representation, Defendant acknowledges that Wellik's testimony is limited; the Parties therefore seem to agree on the scope of Wellik's testimony, and it shall be so limited. As Defendant correctly notes, Plaintiff's broad objection to Wellik's "expansive areas of testimony" is vague. Because it has not identified specific areas of testimony objected to, Plaintiff will need to object at trial to any proffered testimony that seeks to extend past mere authentication.

Plaintiff's request for exclusion of all documents in Defendant's supplemental disclosures

---

[8] In addition, the scheduling order explicitly notes that "Any expert not so named [by the deadlines in the order] may be disallowed as a witness," and "[n]o expert will be permitted to testify to any opinion, or basis or support for an opinion, that has not been disclosed in response to an appropriate question or interrogatory from the opposing party." Dkt. 26 at 1.

United States District Court
Northern District of California

also paints with a broad brush.[9] Undoubtedly, Plaintiff is correct in standing on the deadlines, which will be enforced. "The Ninth Circuit has cautioned that Rule 26(e) is not a loophole through which a party who submits partial expert witness disclosures . . . can add to them to [its] advantage after the court's deadline for doing so has passed." *Plexxikon Inc. v. Novartis Pharms. Corp.*, No. 17-CV-04405-HSG, 2020 WL 1325068, at *2 (N.D. Cal. Mar. 20, 2020) (quoting *Luke*, 323 F. App'x at 500 (internal quotation marks omitted)) (alteration in original). It has also held that "Rule 26(e) creates a duty to supplement, not a right"—and "[s]upplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Luke*, 323 F. App'x at 500 (internal quotation marks and citations omitted) (alteration in original).

A review of the documents makes plain that the additional materials disclosed—such as the 1958 Courthouse Construction Plan Drawings, or the 1973 Eureka Dry Cleaner newspaper ads—are not cabined to those documents that would be "correcting inaccuracies, or filling the interstices . . . based on information that was *not available at the time of the initial disclosure*." Further, although Defendant argues that the records included in the supplemental disclosures are "highly probative," relating to "the historical and the current characterization of the subject property's contamination and the costs related thereto," Dkt. 140 at 9, it offers no actual explanation indicating why specific materials—which include material that clearly postdate the close of discovery, such as correspondence from 2021 or an April 6, 2021 SHN Consulting Engineers First Quarter O&M Report—either could not have been procured earlier or are actually necessary to the resolution of the case. Defendant repeatedly notes that the Regional Board case remains open to this date, and that, as a result, it continues to "direct the County to monitor the

---

[9] Though Plaintiff only attaches Defendant's first, second, and third supplemental disclosures to its motion in *limine*, there is no reason why the same arguments regarding materials produced after the close of discovery ought not apply to materials in Defendant's subsequent supplemental disclosures. Because Defendant is correct that Plaintiff cannot "pick and choose" the supplemental disclosures to which it wishes to object, Plaintiff's motion in *limine* is read broadly to apply to *all* material produced after the close of discovery, including Defendant's fourth and fifth supplemental disclosures.

United States District Court
Northern District of California

1    contaminated areas, prepare workplans and investigate the subject areas." Dkt. 140 at 8. Be that as

2    it may, Defendant's continuing investigation for the Regional Board does not give it license to

3    ignore the case schedule in the instant matter, and Defendant cites no authority to suggest

4    otherwise. As a prior order in this case explained, "[a]t this stage of the proceedings—where . . . a

5    pretrial schedule has been entered—it is incumbent upon the [Parties] to develop whatever facts

6    may be necessary to pursue potential claims of which [they] ha[ve] notice. A party cannot simply

7    wait for facts to present themselves in due course." Dkt. 45 at 7.

8         Defendant also suggests that the supplemental disclosures are harmless and justified

9    because: (1) Plaintiff has always been aware there existed data gaps, as indicated in Niland's

10   initial expert report; (2) Defendant has timely made available the new data; and (3) Plaintiff's own

11   experts relied on some of the disclosures. These arguments do not persuade. Rule 26 requires that

12   the expert witness' written report provide "a *complete* statement of all opinions the witness will

13   express at trial, and the basis and reasons for them," and further, "that these disclosures be made at

14   the times directed by the court." *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 980–81 (N.D. Cal.

15   2014) (citing Fed. R. Civ. P. 26(a)(2)(B)(i) and Fed. R. Civ. P. 26(a)(2)(D)) (internal quotation

16   marks omitted) (emphasis added). A party cannot note in its expert report that there are gaps to be

17   filled, and then use that as a wellspring to justify myriad supplemental disclosures and additional

18   analysis. Allowing such a practice would give rise to the very loophole the Ninth Circuit has

19   warned against. *See Mariscal*, 52 F. Supp. 3d at 983 (finding that under Rule 26(a)(2)(B)(i), the

20   party "was entitled to a complete disclosure of all opinions—not a sneak preview of a moving

21   target"). "[A]lthough the Court ultimately continued . . . trial . . . , this was not an invitation to

22   expand discovery." *Plexxikon*, 2020 WL 1325068, at *4. As a result, pursuant to Rule 37, this

23   motion in *limine* is granted for any documents that were not properly disclosed prior to the close

24   of discovery. Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly Ltd.*, 259 F.3d at 1106 ("Rule

25   37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required

26   to be disclosed by Rule 26(a) that is not properly disclosed.").

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.    Motion in *Limine* #3: Defendant's Allocation and Failure of Due Diligence Affirmative Defenses

Plaintiff's third motion in *limine* seeks to exclude two of Defendant's affirmative defenses, allocation and failure of due diligence, as untimely pled. In support of its motion, Plaintiff invokes Federal Rule of Civil Procedure 12(b), which mandates that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading," and *Incase Designs, Inc. v. Mophie, Inc.*, for the proposition that "[a] defense is insufficiently pleaded if it fails to give the plaintiff fair notice of the nature of the defense." No. 13-CV-00602 RS, 2013 WL 12173931, at *1 (N.D. Cal. July 1, 2013) (citing *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979)).

While Plaintiff correctly identifies "allocation" as missing from Defendant's Answer, this action is undoubtedly "one to assign and/or apportion liability for costs of hazardous waste cleanup of the Civic Center." Dkt. 107 at 6. In light of the aim of the litigation, as well as the conceptual similarities between allocation and apportionment,[10] it is dubious that Plaintiff would be prejudiced by the assertion of an allocation affirmative defense, which Plaintiff has itself asserted in the matter. Accordingly, although Defendant's procedural failure to plead allocation timely is noted, Plaintiff's motion to exclude it is denied.

Defendant's omission of "failure of due diligence," however, cannot be excused. The defense is not sufficiently related to the principal objective of the litigation or sufficiently similar to timely asserted defenses, and Defendant provides no explanation whatsoever for its delay in raising the defense. As a result, the scope or nature of the defense is indeed unclear, and Plaintiff would be prejudiced by its lack of notice and inability to conduct relevant discovery. Plaintiff's motion regarding Defendant's "failure of due diligence" affirmative defense is, therefore, granted.

### D.    Motion to Exclude Supplemental Report of Joseph Niland

Plaintiff also moves to exclude Niland's supplemental report pursuant to Rule 37(c)(1), arguing that the report goes well beyond the bounds of supplementation, instead attempting to

---

[10] Indeed, Defendant's portion of the Pre-Trial Statement suggests that it intends to assert allocation interchangeably with apportionment and divisibility. See Dkt. 122 at 4 (asserting a defense of "Appointment/Allocation/Divisibility").

bolster Niland's expert opinions based on investigations that could and should have been undertaken prior to the close of expert discovery. Defendant responds that the report is properly supplemental under Rule 26(e) because it is based on newly collected data from ongoing investigations to comply with directives from the Board to prepare an updated remedial action plan for the Civic Center.

Defendant's reliance on Rule 26(e) is misplaced. As the Ninth Circuit has explained, Rule 26(e) creates a duty to supplement, not a right to do so. *Plexxikon Inc. v. Novartis Pharms. Corp*, No. 17-CV-04405-HSG, 2021 WL 2577536, at *5 (N.D. Cal. June 23. 2021) (citing *Luke*, 323 F. App'x. at 500). Nor does it create "'a loophole through which a party who submits partial expert witness disclosures, or who wishes to revise [its] disclosures in light of [its] opponent's challenges to the analysis and conclusions therein, can add to them to [its] advantage after the court's deadline for doing so has passed.'" *Id*. (quoting *Luke*, 323 Fed. App'x at 500) (alterations in original). Rather, "[t]he supplementation requirement is only intended to 'correct[] inaccuracies, or fill[] the interstices of an incomplete report based on information that was not available at the time of the initial disclosure.'" *Id*. (quoting *Luke*, 323 Fed. App'x at 500) (alterations in original).

Niland's supplemental report, which adds to Opinions 1 through 6—in other words, to all but the last Opinion in the original report—exceeds the permissible scope of supplementation under Rule 26(e). Though the report indicates that this supplement was undertaken because of "new information, data and communications," much of the cited information, data, and communications is not actually *new*; instead, it is information that was either "available at the time of the initial disclosure," *id.*, or information that could have been with any effort by Defendant.

For instance, although the original expert report was only thirteen pages in its entirety,[11] and Opinion 2 was initially approximately two pages, the proffered "supplements" to Opinion 2 amount to five pages in total. The original Opinion identifies that "there is likely more than one source of PCE in the area"—among them the former auto repair garage ("a likely source") and the

---

[11] Excluding the list of References in Section 5.

Sign Shop Yard ("a possible source")—and punts by declaring that "[t]he contribution of other sources in the Site area has not been fully assessed." Niland Expert Report at 6. By contrast, the Supplemental report opines that "the former auto repair garage . . . is a *primary* contributor of cVOCs." Dkt. 113-2, Ex. 7 ("Niland Supplemental Report") at 5. To do this, it references "recently compiled sources" of *historical* newspaper advertisements and other sources to explain that the services offered at the property were commonly associated with spills and illicit discharge of hazardous waste. *Id.* at 5–6. Yet these items, boasting a 1920s vintage, are simply not new—as discussed earlier, Defendant offers no explanation why this historical analysis could not have taken place in accordance with case deadlines.

The same is true of the new soil and groundwater testing that Defendant conducted after the close of expert discovery, both for the auto repair garage and the Sign Yard. Issues such as whether the Sign Yard was a source of contamination or whether the Sump System exacerbated contamination obviously could have been investigated earlier; given their inclusion in the original report as potential sources, Defendant clearly believed they were relevant. Admitting that "sources in the Site Area ha[ve] not been fully assessed," Niland Expert Report at 6, and indicating that "additional work" is needed does not, contrary to Defendant's suggestion, create a placeholder for Defendant to return to at its discretion.[12] Courts have rejected supplemental expert reports when they "attempted to deepen and strengthen the expert's prior reports." *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 639 (D. Haw. 2008) (citing *Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003)) (internal quotation marks omitted). So, too, have courts struck supplemental expert reports for untimeliness. *See, e.g.*, *Martinez v. Costco Wholsesale Corp.*, 336 F.R.D. 183, 189 (S.D. Cal. 2020). Niland's supplemental report clearly does not

---

[12] If Defendant required additional time to conduct testing for the resolution of the present action, the proper course of action would rather have been to move for a modification to the case schedule. Notably, Defendant previously moved to stay the matter until site investigation was completed and the Board approved a remedial plan. As Defendant could have sought, but did not seek, to stay as early as October 2019, and as Defendant "fail[ed] to present a compelling justification" as to why the additional data was needed, the motion was denied. Dkt. 107 at 5. Any attempt to circumvent that order would be, as Plaintiff points out, highly improper.

dutifully seek to correct an inaccuracy or fill the interstices of an incomplete report, and it overreaches in its attempt to shoehorn in tests and analysis that Defendant failed to conduct in a timely fashion, under the guise of supplementation. As another court has noted:

> To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given. This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant a new round of consultation with one's own expert and virtually require new rounds of depositions. That process would hinder rather than facilitate settlement and the final disposition of the case.

*KFD Enters., Inc. v. City of Eureka*, No. 08-4571 MMC JSC, 2013 WL 2384236, at *5 (N.D. Cal. May 30, 2013) (quoting *Beller*, 221 F.R.D. at 701). These concerns are particularly sharp where, as here, a party seeks continuous updates. *See id.* at *4–5 (expressing "concern about continuous supplementation of expert reports based on 'new information'" and requiring leave of court or a stipulation for any supplemental expert report).

The very same issues that plague the "supplement" to Niland's second opinion extend to the other opinions as well. The supplement to Opinion 1, for example, includes new data and analysis about contaminant concentration in HCC-1 and HCC-6, which, as Plaintiff points out, were not explicitly explained in the original report—a fact Niland acknowledged in his deposition. *See* Niland Dep. at 110:2-14 (explaining that he did not provide analysis in his report about why groundwater concentrations in HCC-1 had been decreasing).[13] As to Opinion 3, the supplement concludes that the contaminants have "migrated vertically downward north of the former auto repair shop," Niland Supplemental Report at 10, and makes no reference to the previously proffered "watercourse" theory. This appears to be a different theory, and Niland's report does not help explain otherwise. Indeed, the supplement also offers that the previous data led to unclear

---

[13] Though not available in Plaintiff's motions in *limine* filing, this was available in Plaintiff's Motion to Strike and Exclude the Supplemental Expert Report of Joseph Niland.

conclusions, and "secondary migration pathways were assumed to be a factor in this lack of clarity," but with the benefit of "supplemental data, it is now understood that . . . migration pathways may not be a significant factor." *Id.*

Defendant argues that the additions are not "completely new areas" on which Niland opines. Dkt. 114 at 5. Yet even if the topics are broadly similar, the supplement introduces new justifications and sometimes wholly new data—not resulting from mere retests of the exact same analyses conducted for the original report, but from new tests—that Plaintiff lacks the opportunity to test. This is particularly true of new sampling, which Plaintiff might have been able to collect and test in parallel, had Defendant informed Plaintiff of the specific testing before the work was performed.

Moreover, contrary to Defendant's arguments, this additional material is neither justified nor harmless. Defendant again relies on the fact that the Board required further data collection to assess and remediate the contamination. As discussed earlier, however, that the Board requires additional data from the County explains why Defendant is doing further testing; but it does not justify its failure to undertake such testing prior to the deadlines in this case. The objectives of the Board's oversight with respect to the contamination and the present action are not one and the same. Accordingly, these proceedings are not dictated by the Board's actions—particularly where, as here, there would be prejudice to Plaintiff. Even setting aside the technical difficulties with attempting to reproduce Niland's testing, any further deposition of Niland would require re-opening discovery, risking further delay. It bears repeating from the previous order denying Defendant's motion for a stay that "as both fact and expert discovery have long-since closed," "modify[ing] the scheduling order to reopen discovery . . . at this juncture, after cross-motions for summary judgment have been filed and resolved, would be prejudicial to [Plaintiff] and impede—rather than enhance—the orderly and efficient resolution of the action." Dkt. 107 at 5–6.[14]

---

[14] The cases on which Defendant relies—such as *Wechsler v. Macke Int'l Trade, Inc.*, 221 F.R.D. 619 (C.D. Cal. 2004), *Finjan, Inc. v. Symantec Corp.*, No. 14-CV-02998-HSG(JSC), 2018 WL 620156 (N.D. Cal. Jan. 30, 2018), and *Liberty Mut. Fire Ins. Co. v. Bosa Dev. Cal. II, Inc.*, No. 17CV666 AJB (BGS), 2019 WL 3554938, at *2 (S.D. Cal. Aug. 5, 2019)—are distinguishable.

ORDER ON PLAINTIFF'S MOTION TO STRIKE AND MOTIONS IN *LIMINE*
CASE NO. 18-cv-07383-RS

United States District Court
Northern District of California

Defendant fails to provide reasons to depart from this conclusion, and further delay will not be countenanced.

## IV.  CONCLUSION

For the reasons discussed above, Plaintiff's first motion in *limine* (exclusion of Niland's opinions) is denied; Plaintiff's second motion in *limine* (exclusion of untimely disclosures) is granted; Plaintiff's third motion in *limine* (exclusion of Defendant's affirmative defenses) is granted in part (with respect to the failure of due diligence defense) and denied in part (with respect to the allocation defense); and Plaintiff's Motion to Exclude Niland's Supplemental Report is granted.

**IT IS SO ORDERED**.

Dated: March 1, 2023

_____
RICHARD SEEBORG
Chief United States District Judge

_____

Here, Plaintiff had no hand in making it difficult for Defendant to obtain relevant evidence, *Wechsler*, 221 F.R.D. at 622; Defendant's supplemental report is not solely relying on evidence that Plaintiff has always had access to, nor did Plaintiff fail to disclose its arguments properly during discovery, *Finjan*, 2018 WL 620156, at *2; and discovery *has* closed and trial *is* looming. *Bosa*, 2019 WL 3554938, at *6.

ORDER ON PLAINTIFF'S MOTION TO STRIKE AND MOTIONS IN *LIMINE*
CASE NO.  18-cv-07383-RS